## WASHINGTON & O. D. RY. CO. v. McPHERSON.

Court of Appeals of District of Columbia.
Submitted April 5, 1928. Decided
June 4, 1928.

No. 4659.

1. Master and servant ⟜137(4)—Failure of motorman to stop or slow train when signaled by flagman desiring to board train held negligence.

Failure of motorman to stop or slow down his train when signaled by flagman desiring to board train, in accordance with orders requiring him to reach preceding train on which he was employed, held to constitute negligence.

2. Master and servant ⟜180(2, 3)—Common-law doctrine that employee assumed risk of injury through negligence of fellow servant held abrogated as to interstate carriers (45 USCA §§ 51–59).

Common-law doctrine that negligence of a fellow servant is not negligence of employer, and that he is not responsible in damages for injury inflicted upon one employee by carelessness of another has been abrogated as regards common carriers engaged in interstate commerce by virtue of Act April 22, 1908 (45 USCA §§ 51–59; Comp. St. §§ 8657–8665), making common carriers answerable for damages for injuries caused by negligence of any of officers, agents, or employees of carrier.

3. Master and servant ⟜286(31)—Evidence in flagman's action for injuries as to motorman's negligence in failing to slow train after signal to stop required submission to jury.

In action against railway for injuries to flagman in attempting to board moving train after signaling motorman, evidence as to negligence of motorman in failing to slow train after signal held sufficient to require submission to jury.

**4. Witnesses** ⊂⟩389—**Court properly refused to admit affidavits on defendant's request after plaintiff cross-examined defendant's witness relative to statements therein.**

Where plaintiff, after securing admission on cross-examination by witness for defendant as to having made certain statements in affidavit previously sworn to, offered no part of such affidavits in evidence, their admission when offered by defendant on redirect examination was properly refused by court.

Appeal from Supreme Court of District of Columbia.

Action by Arthur W. McPherson against the Washington & Old Dominion Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

W. J. Lambert and R. H. Yeatman, both of Washington, D. C., for appellant.

Crandal Mackey, of Washington, D. C., for appellee.

Before ROBB and VAN ORSDEL, Associate Justices, and SMITH, Judge of the United States Court of Customs Appeals.

SMITH, Acting Associate Justice. This is an appeal from a judgment of the Supreme Court of the District of Columbia in favor of the plaintiff, Arthur W. McPherson, and against the Washington & Old Dominion Railway Company, the defendant and appellant, for the sum of $7,500, for personal injuries alleged to have been sustained by the plaintiff by reason of the negligence of the defendant in the operation of one of its trains.

**Statement of Evidence Submitted to the Jury.**

The Washington & Old Dominion Railway Company, a corporation, at the times hereinafter specified, owned and operated a line of railway which carried freight, mail, and passengers between Bluemont, Va., and the city of Washington in the District of Columbia. The rules of the company required that all extra trains should leave the track clear for the passage of regular trains and avoid interference with the time schedule prescribed for them. Under the regulations, the work extra train was an outlaw, and, whether standing or moving, had to protect itself against other extras. It was the duty of motormen and enginemen to keep a vigilant and constant lookout for signals and especially for a display of red which meant "danger, stop." Trainmasters were charged with the operation of trains, the movement of rolling stock, and traffic. All employees, including flagmen, were subject to the order of the trainmaster, and upon him rested the final responsibility for the safety and movement of trains. The signaling of trains was the special charge of flagmen, and it was not only the custom but the duty of flagmen to board moving trains to which they were assigned. They were bound to obey orders of the trainmaster and conductor, but were not obliged to wait for orders or for signals when the train to which they belonged needed protection.

On September 18, 1919, a work train, operated by the company for the purpose of transporting labor, material, tools, and implements used in keeping its tracks and roadbed in proper repair was proceeding from Bluemont eastward towards Washington. During the trip the conductor of the work train received telegraphic orders to look out for extra train No. 300 which was following the work train and getting close. In consequence of those orders, the conductor, on finding the main line blocked at Goose Creek Bridge, ordered the plaintiff, the work train flagman, to flag and board the following train. The plaintiff complied with the conductor's instructions, and, after flagging No. 300, the following train, boarded it for the purpose of returning to the work train of which he was the flagman. When No. 300 reached Belmont Park, Trainmaster La Hue told the plaintiff that No. 300 was going no farther, and directed him to take passenger train No. 12 in order that he might catch up with his work train. McPherson boarded passenger train No. 12, and, upon reporting to Patterson, the motorman thereof, told him to look out for the work train ahead. Although McPherson was well known to Patterson as the flagman of the work train, "he turned around in a very angry manner and made no reply on receiving McPherson's warning." When passenger train No. 12 reached Ashburn Station, McPherson, who was then standing within three feet of Patterson, alighted and went to the station telegraph operator for the purpose of securing information as to the location of his work train. McPherson was informed by the telegraph operator that the work train was at Sterling, a point east of Ashburn and nearer to Washington.

While McPherson was seeking information as to the location of his work train, Motorman Patterson backed train No. 12 into a siding to the westward of the station to allow train No. 5 from Washington to pass. Patterson's train remained on the siding until No. 5, after discharging and taking on passengers, departed for points to westward, thereby leaving the track clear at Ash-

burn for east-bound trains. The switches were then thrown and passenger train No. 12 came out of the siding and onto the main line. McPherson testified that as No. 12 came up to the station he stood with his right foot near the rail and waved his red flag which was the signal to stop. According to the witnesses for the plaintiff, Patterson, the motorman of No. 12, was looking at McPherson while he stood near the track, and there was nothing to prevent Patterson from seeing the red flag signal waved by McPherson. McPherson said that, standing near the track with the train coming towards him, he could not well tell the speed of the train, but that it appeared to him that its speed was not more than 4, 5, or 6 miles per hour. Noting that the train was not going to stop or reduce its speed, he braced himself to catch the handrail of the second coach, believing that the speed of the train was not so great as to render the boarding of it unsafe. His left hand missed the rail and broke the grip he managed to get with his right hand. The toe of his right foot slipped off the step of the car, and his right leg was caught under the wheels and so badly crushed that it had to be amputated.

The evidence is uncontradicted that it was the practice and custom of flagmen to board moving trains, and that the proper discharge of their duties as flagmen required them to do so. At the time that McPherson made his attempt to get on the train, its speed was 10 or 12 miles per hour according to the brakeman, 20 miles per hour according to Flagman Havener, and from 12 to 18 miles per hour according to other witnesses. Flagman Schooley, after throwing the switch to let No. 12 enter the main track, boarded the train at the switch while it was going slowly. Schooley testified for the defendant that the train began to pick up speed after it left the switch, but that when it got to the station it had not quite reached a speed of 4 or 5 miles an hour. Patterson, the motorman, a witness for the defendant testified that, when the switch was thrown to bring No. 12 onto the main line, *he had the controller almost entirely cut off and came almost to a stop to pick up Flagman Schooley.* Patterson admitted that he began to build up speed after Schooley boarded the train, and that when the train reached the station its speed was in the running series. Patterson stated that *after he saw McPherson standing on the station platform at Belmont he did not see him again, and that McPherson did not come out to the track or wave a red flag* as the motorman's end of No. 12 passed Ashburn. Pat-

terson knew that McPherson was a flagman, and had seen him on the work train. Testimony was introduced on behalf of the defendant tending to show that the plaintiff was talking to some young women on the platform with his back to the track, and that he turned and ran to catch the train just as it was about to pass the station.

During the course of the trial, Pauline Bodmer, a witness for the defendant, testified on direct examination that, at the time No. 12 was approaching the station on its way to Washington from the siding, she was facing the track, and that McPherson was talking to her with his back to the track; that she saw nothing in McPherson's hand; that, as the front of the first coach passed the station, McPherson turned and ran to catch the train; that the train was not moving very fast, not more than 10 miles an hour; that she was facing the train all the time, and that she saw McPherson grab the rail on the rear end of the first coach and go under; that she then heard some one scream and the sounding of the emergency whistle and went home. On cross-examination, the witness said that she signed an affidavit dated April 5, 1922, in which she stated that she did not recall seeing McPherson with a flag or waving a flag; that she stated in an affidavit made on April 6, 1922, "I turned my back when he (McPherson) left me to board the train, but turned around facing him again just as he attempted to board the train." On redirect examination, counsel for the defendant propounded to the witness the following question:

"Q. I want to ask you whether you said this to Mr. McPherson's father: 'I cannot say how fast the train was running, but I think I could have boarded the train myself'?"

To that question plaintiff's counsel objected. The objection was sustained, whereupon counsel for the defendant offered the affidavit of the witness, made on April 6, 1922, in evidence, and argued that it should be admitted because plaintiff's counsel had examined the witness as to what she had said in her affidavit. The court refused to admit the affidavit in evidence, and to that ruling the defendant excepted.

**Proceedings on Conclusion of Presentation of Evidence by Both Parties.**

On the evidence submitted by both parties, the defendant moved the court to direct the jury to find a verdict in favor of the defendant on the ground that a prima facie case of negligence chargeable to the defend-

ant had not been made out and that plaintiff had assumed the risk of boarding the train while it was still in motion. The court denied the motion for a directed verdict, and to that ruling the defendant excepted.

After argument of counsel and the instructions of the court, the jury retired, and subsequently returned a verdict in favor of the plaintiff for $7,500.

### Opinion.

Counsel for the appellant contends that the refusal of the court to grant the motion for a directed verdict was error, and that the judgment entered on the verdict returned should therefore be reversed. In support of that contention it is strenuously argued, first, that McPherson was not assigned to duty as a flagman on passenger train No. 12 and was not one of the crew of that train; second, that Patterson, the motorman of No. 12, owed no duty to McPherson, and that McPherson had no right to assume that Patterson would slow up the train in order that it might be more safely boarded; third, that it was the primary duty of McPherson as a flagman to look out for himself, and that he assumed the risk of boarding train No. 12 while it was in motion.

It is true that McPherson was not assigned to duty as flagman of train No. 12, and that he was not one of the crew of that train. It is also true, however, that he was on train No. 12 under orders from competent authority and in the performance of his duty to return to the work train to which he had been assigned as flagman. Patterson knew that the plaintiff was a flagman on the work train, and was told that that train was to the eastward and ahead of train No. 12 and not to the westward and rear thereof.

[1] By virtue of the jury's verdict, it must be taken as true that Patterson saw McPherson standing near the track and waving his red flag. The regulations direct motormen to keep a constant, vigilant lookout for signals, and, even if Patterson did not see the red flag, it was his duty to see it when waved close to the track. Under the rules of the company, red is a danger signal, and the display of a red flag or a red lantern by a signalman, a trainman or others to train engineers and motormen signifies "danger, stop." Even if Patterson was satisfied that there was no danger to his train, its passengers or others, he knew that McPherson was a flagman, and that he had boarded train No. 12 for the purpose of reaching his work train, which was an outlaw and more than all other trains required a flagman for protection.

McPherson was not a mere interloper, but an employee of the railway company engaged in the performance of his duty. Knowledge of those facts is chargeable to the motorman of train 12, and, while he may not have been bound to bring his train to an actual stop in order that McPherson might board it, the exercise of proper care required him to reduce the speed of his train to the point where it might be safely boarded by a flagman. Patterson, without a signal was mindful to slow down for Flagman Schooley, and it is not apparent just why he should be excused for ignoring a red flag signal and failing to stop his train or reduce its speed in order that it might safely take on McPherson. By the verdict of the jury all conflicts in the testimony were resolved in favor of the plaintiff, and we must hold that the failure of Patterson, the motorman, to stop or slow down his train when signaled by McPherson was negligence.

[2] Under the common-law rule an employee assumed the ordinary risks of his employment and among them the risk of being injured by and through the negligence of his fellow servants, in the employment of whom ordinary care was exercised. That rule, if it still prevailed, would preclude a recovery by McPherson on the evidence submitted. The doctrine that the negligence of a fellow servant is not the negligence of the employer, and that he is not responsible in damages for injuries inflicted on one employee by the carelessness of another, has been abrogated by statute as to common carriers engaged in interstate commerce. By the Act of April 22, 1908, 35 Stat. 69 (45 USCA §§ 51–59; Comp. St. §§ 8657–8665), common carriers operating between the District of Columbia and any of the states or territories are made answerable in damages for injuries to employees caused in whole or in part by the negligence of any of the officers, agents, or employees of such carriers. By virtue of that statute, even if there was negligence on the part of McPherson which contributed to his injury, he would be entitled to recover from the carrier damages diminished by the proportion of negligence attributable to him when compared with that of Patterson.

[3] There was evidence in the case sufficient to sustain a finding by the jury, first, that Patterson knew that McPherson had boarded train No. 12 for the purpose of rejoining the work train of which he was flagman; second, that Patterson saw McPherson standing at the track waving his red flag as No. 12 was coming to the station, and that Patterson knew that that signal meant to stop or at

least to slow down his train; third, that, as an experienced motorman, Patterson knew the speed to which his train should be reduced in order that McPherson might board it with safety; fourth, that he slowed down his train and safely took on Schooley, his flagman, after leaving the switch, and that he thereupon increased the speed of his train until at the station it was at a point in the running series; fifth, that McPherson, from his position near the track could not gauge the speed of the train, and he was justified in assuming that, on his giving the signal with the red flag, Patterson would at least slow down to the proper speed. As those facts justified the conclusion of law that the motorman of train No. 12 was guilty of negligence and that McPherson did not assume the risk of boarding the train while it was in motion, the court was warranted in refusing to direct a verdict in favor of the defendant. See Ches. & Ohio Ry. v. De Atley, 241 U. S. 310, 36 S. Ct. 564, 60 L. Ed. 1016.

In Ches. & Ohio Ry. v. De Atley, supra, De Atley was a brakeman on the train which injured him. He was sent by the train engineer to a nearby railway telephone to ascertain the whereabouts of west-bound train No. 1. He was unable to procure the information at the railway telephone, got into the cab of the locomotive and proceeded with the train to a signal tower, where he was again directed by the engineer to ascertain, if possible, the location of the west-bound train. De Atley alighted, and, after securing the information desired by the engineer, attempted to get on his train, which was approaching at a speed of about 12 miles an hour. De Atley apparently gave no signal to stop or slow down, and from his position could not accurately judge the speed of the train. The speed of the train and his weight loosened his hold on the handrail and his footing on the step, with the result that he fell beneath the wheels and lost his arm. This case differs from Ches. & Ohio Ry. v. De Atley, supra, in the respect that McPherson was not a member of the crew of the train which injured him. He was on duty, however, as a flagman, and the motorman violated the rules of the company when he refused to heed the flagman's signal to stop or slow down. We think that the case made out by McPherson was even stronger than that submitted to the Supreme Court of the United States in Ches. & Ohio Ry. v. De Atley, supra, inasmuch as McPherson's red flag signal required the motorman to stop or slow down.

[4] Pauline Bodmer, a witness for the defendant, having admitted on cross-examination that she had made certain statements in affidavits sworn to by her and no part of said affidavits having been offered in evidence by the plaintiff, their admission in evidence when offered by the defendant on redirect examination was properly refused by the court. If any part of either of the affidavits had been offered and received in evidence to impeach or contradict the witness, a different legal issue would have been presented.

The judgment appealed from is affirmed, with costs. Affirmed.